**HEADNOTE:** *SEQUEIRA V. STATE*, No. 2148, Sept. Term, 2019

**USE OF A FIREARM IN THE COMMISSION OF A FELONY OR CRIME OF VIOLENCE - - MULTICOUNT INDICTMENT CHARGING PREDICATE CRIMES - - UNITY OF OPERATION OF MULTICOUNT INDICTMENT - - CONVICTION BASED ON UNCHARGED PREDICATE CRIMES - - CONSPIRACY TO USE A FIREARM IN THE COMMISSION OF A FELONY OR CRIME OF VIOLENCE.**

After an altercation with one of three security guards working at a restaurant, during which the defendant claimed to resolve disputes by shooting, the defendant rounded up two accomplices, made threats against the security guards, waited in his car in the surface parking lot outside the restaurant for the guards to come outside, and then drove his car forward and through the lot while an accomplice shot a gun out of the window. At the same time, two restaurant patrons were walking to their car in the parking lot. One of the security guards fired back. No one was injured.

In a multicount indictment, the defendant was charged with several counts of first-degree assault (felonies/crimes of violence), each of which named a security guard as a victim, and with use of a firearm in the commission of a felony or crime of violence and conspiracy to do the same, neither of which named a victim. The State's original theory of prosecution was that the defendant committed first-degree assaults (as an accomplice) against the security guards. During trial, when there was conflicting evidence about the direction in which the shots were fired, the State took the position that the defendant could be convicted of the charged first-degree assaults against the security guards, or uncharged first-degree assaults against the two restaurant patrons. The court approved a verdict sheet and jury instructions that would permit both theories of prosecution to go to the jury. Ultimately, the defendant was acquitted of all first-degree assaults against the security guards but was convicted of use of a firearm in the commission of a felony or crime of violence (first-degree assault) and conspiracy to commit that crime.

*Held*: Judgment of conviction for use of a firearm in the commission of a felony or crime of violence reversed. When the State charges a defendant by multicount indictment with lead felonies/crimes of violence and with use of a firearm in the commission of a felony/crime of violence and it is not facially evident that the use of a firearm stemmed from an entirely separate incident, the indictment operates as a whole and the predicate crime that is an element of the compound crime of use of a firearm takes its meaning from the lead counts of the

indictment. Because the defendant was charged with predicate crimes against specific victims, he could not be convicted of use of a firearm based on uncharged predicate crimes against other possible victims. The trial court erred by allowing jurors to be instructed in such a way that they could base convictions for use of a firearm and conspiracy to use a firearm on uncharged first-degree assaults. Because the defendant was acquitted of the first-degree assaults against the security guards, the only predicate crimes that could have supported his use of a firearm conviction, he cannot be retried on the use of a firearm count.

With respect to the conspiracy to use a firearm count, the acquittals of the charged predicate crimes do not have the same effect, as the essence of the crime is the agreement to commit the predicate crime(s). The evidence was legally sufficient to support a conviction of conspiracy to use a firearm to commit the charged crimes of first-degree assault against the security guards. It was not legally sufficient to support a conviction of conspiracy to use a firearm to commit the uncharged crimes of first-degree assault against the restaurant patrons walking through the parking lot, however. Because of the trial court error, we cannot tell whether the conspiracy was based on the former or the latter. For that reason, the judgment of conviction is vacated and the conspiracy count is remanded for further proceedings.

Circuit Court for Montgomery County
Case No. 135196C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2148

September Term, 2019

_____

MARCOS DANIEL SEQUEIRA

v.

STATE OF MARYLAND

_____

Kehoe,
Gould,
Eyler, Deborah S.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  April 1, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

* Leahy, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

A jury in the Circuit Court for Montgomery County convicted Marcos Sequeira, the appellant, of use of a firearm in the commission of a felony or crime of violence ("use of a firearm"), for which he was sentenced to 17 years in prison, and conspiracy to commit that offense, which the court merged for sentencing. The jury acquitted Sequeira of three counts of first-degree assault, each of which named a specific victim. Those were the only counts sent to the jurors that were predicate crimes for the use of a firearm charge. The use of a firearm and related conspiracy counts did not identify a particular victim or victims.

This case raises as a primary issue whether, when a multicount indictment identifies particular victims in the counts charging predicate crimes, the defendant may be convicted of use of a firearm not in the commission of those charged predicate crimes but in the commission of uncharged predicate crimes against other victims in the same incident. We answer that question in the negative and shall reverse Sequeira's conviction for use of a firearm. For the reasons we explain, that count cannot be retried. We shall vacate Sequeira's conviction for conspiracy to commit the charged predicate crimes and remand for further proceedings on that count.

## FACTS AND PROCEEDINGS

The incident giving rise to this case took place at 2 a.m. on December 1, 2018, on the surface parking lot of a strip shopping center in Silver Spring. As Sequeira drove his car through the lot, in front of Sole D'Italia restaurant, one of his two passengers fired a handgun out the window. At the time, restaurant security guards Jermaine Brown, Desmond Brown, and Alvester Jacobs, and disc jockey John Callahan, were standing on

the sidewalk in front of the restaurant and two customers, Rashad Hall and William Powell, were walking through the parking lot to their vehicle. Fortunately, no one was injured.

Sequeira and Quinnton Brown, one of Sequeira's passengers, were separately charged in identical multicount indictments (differing only in their names) setting forth the following counts, in this order:

- Counts One, Two, and Three: Attempted first-degree murder
- Counts Four, Five, and Six: Conspiracy to commit first-degree murder
- Counts Seven, Eight, and Nine: First-degree assault
- Counts Ten, Eleven, and Twelve: Conspiracy to commit first-degree assault
- Count Thirteen: Use of a firearm in the commission of a felony or crime of violence
- Count Fourteen: Conspiracy to commit use of a firearm in the commission of a felony or crime of violence.

In each of counts one through twelve, one of the security guards was named as the victim. The last two counts did not name a victim.

Sequeira and Brown were tried jointly. The State called thirteen witnesses, including the security guards[1], Callahan, Hall, police officers who responded to the scene, and a firearms examiner. The evidence included surveillance footage from four Sole D'Italia cameras, three inside and one outside. The following was adduced.

The three security guards were working at Sole D'Italia on the night of November 30, 2018, and into the early morning hours of December 1, 2018. Desmond and Jacobs

---

[1]We will use first names for Jermaine Brown and Desmond Brown to distinguish them from Quinnton Brown.

were armed. At 11:43 p.m., Sequeira parked his black Mercedes coupe directly in front of the restaurant and entered, alone.[2] Around midnight, he overheard Jermaine tell a regular patron that she and her friend could not use the men's restroom and heard the patron make a "smart" remark in response. Jermaine noticed Sequeira standing nearby and, recognizing him as the bartender's ex-boyfriend, said, "no offense," adding, "just doing my job." Sequeira looked Jermaine "up and down" and replied, "I'm good." Jermaine asked, "sure you good[?]" and suggested they could go outside to have a conversation. Jermaine thought Sequeira was acting "defensive." The patron and her friend alerted Desmond and Jacobs about the "heated discussion." Desmond and Jacobs tried to de-escalate the situation, which Desmond described as "tense." Jacobs heard Sequeira tell Jermaine, "I don't fight, I shoot."

Sequeira left the restaurant around 1:00 a.m., an hour before closing time. He returned at 1:41 a.m., accompanied by Brown and Daniel Rivas.[3] This time, he did not park his car near the entrance. The three men entered the restaurant and walked through the bar area, where the security guards saw them. All three security guards described Brown as a tall African American man wearing a gray or black hooded jacket and Rivas as a Hispanic man with his hair in a bun and wearing a grey puffy coat.

---

[2]Because, as mentioned, there was surveillance footage introduced into evidence, we use the time stamps from the videos rather than the time estimates from the witnesses. The time stamps on the videos were advanced by one hour and, thus, we have corrected the times.

[3]Rivas was not charged because he could not be located.

Three minutes later, Sequeira, Brown, and Rivas left. As they walked to the door, past the security guards, Sequeira told Jermaine, "I'm going to see you, OG." Jermaine understood OG to mean "original gangster" and took the words as a threat. Brown asked Jermaine, "What's up with you?" Jermaine also took that as a threat. Jacobs and Desmond overheard these remarks. Jacobs characterized Sequeira's tone as "aggressive" and said Brown got "kissing close" to Jermaine before saying, "What's up?"

Jermaine stayed inside the restaurant for a while, helping to close the bar. Desmond and Jacobs stood outside in front of the restaurant and waited for Jermaine. The interaction with Sequeira and his companions had made them concerned for Jermaine's safety. At 1:56 a.m., Jermaine joined Desmond and Jacobs outside.[4] They stood in the parking lot, just past a row of parked cars immediately in front of the restaurant. They noticed an occupied black Mercedes coupe parked in the middle of the parking lot, facing the restaurant. All three security guards identified Sequeira as the person sitting in the driver's seat of that vehicle. Desmond could not see the other occupants. Jermaine saw Brown in the front passenger seat. Jacobs thought Rivas was in the front passenger seat and Brown was in the back seat, on the passenger side.

A minute later, Jermaine, Desmond, and Jacobs walked back to the sidewalk right outside Sole D'Italia. Callahan, the disc jockey, had just finished packing his equipment into his Honda CRV, which was parked directly in front of the restaurant, and was standing on the sidewalk too.

---

[4]Jermaine's close friend Todd Caldwell was there too. He left to buy cigarettes at a nearby gas station and was not present for the shooting incident.

Seconds before 2 a.m., Sequeira drove forward and turned right out of his parking space, then drove the Mercedes parallel to the sidewalk near, but not directly in front of, Sole D'Italia and then away from the restaurant.[5] As he did so, an arm emerged from a window of the vehicle and began firing a gun. The security guards testified that the Mercedes continued driving away from Sole D'Italia, made another right turn, toward an exit onto Layhill Road, and then made a third right turn onto the southbound lane of Layhill Road. From this position, the shooter fired several more rounds toward the parking lot.

The eyewitness testimony varied from witness to witness and internally with respect to the shooter's location in the Mercedes and where the shots were fired. Jermaine testified that the shooter was an African American man in the front passenger seat whose arm was clothed in a gray sweatshirt sleeve and that the shots were fired "in the direction of where [Jermaine, Desmond, and Jacobs] were [standing]." Later in his testimony, he acknowledged that the first round of shots was fired in the direction of Hall and Powell.[6] In a police interview at the scene, captured on an officer's body camera, Jermaine said, "they shot over there first[,]" meaning where Hall and Powell were walking.

---

[5]The State theorized that Sequeira was aware of the surveillance cameras and did not want the Mercedes to be captured on video.

[6]None of the testimony established a link between the security guards and Hall and Powell or that they even knew each other. We are using Hall and Powell's names instead of "the two men walking across the parking lot" for ease of discussion.

According to Jacobs, a "black arm" emerged from the rear passenger side window of the Mercedes and fired shots in his direction. He returned fire. He agreed that he may have told officers at the scene that the shots were fired in the direction of Hall and Powell, one of whom was wearing a yellow construction vest. Desmond testified that an African American man's arm holding a gun came out of the passenger's window on the side of the Mercedes closest to the restaurant. He did not say where the shots were fired but acknowledged telling a police officer at the scene that the passenger fired the gun in the direction of a man on the parking lot who was wearing a neon hooded sweatshirt. Callahan testified that he heard gunshots and saw a flash from near the Mercedes but could not say where the shots came from. He agreed that he had told the police at the scene that the gunshots were not close to him and it seemed as if the shooter had fired into the air.

Hall testified that Powell was wearing a bright yellow vest. He explained that, as he and Powell were walking across the parking lot, he saw someone shooting out of the passenger side of a Mercedes. He did not think the shots were directed at him. He acknowledged that he may have told police at the scene that the shots were fired into the air.[7]

Surveillance footage and crime scene evidence showed that, in response to the gunshots, Jacobs fired five shots in the direction of the Mercedes. At the same time,

---

[7]Powell did not testify.

Desmond dropped to the ground near Jacobs, Jermaine took cover behind Callahan's vehicle, and Callahan ran around to the back of the restaurant.

Officer Anthony Copeland was on patrol nearby and heard the first volley of gunshots. He responded immediately and saw the Mercedes speeding through the shopping center parking lot. He heard a second volley of gunshots and saw muzzle flashes coming from the Mercedes.[8] He remained at the scene and interviewed witnesses. In an excerpt from his body-worn camera footage that was played for the jury, he told another officer that it appeared that the shooter was firing into the air.

The Mercedes was found parked on a nearby side street in front of a residence. It had two bullet holes in the trunk and a shell casing was lodged between the trunk and the driver's side of the car. Ballistics evidence showed that five shell casings located near the door to Sole D'Italia had been fired from Jacobs's gun. Two shell casings were found between 60 and 112 feet north of Sole D'Italia, in front of a bank and an animal hospital in the shopping center, and the casing found in the Mercedes was fired from a single weapon, but not Jacobs's weapon. A Honda Civic parked on the surface lot across from Sole D'Italia in the same row as the Mercedes had three bullet holes in it.

---

[8]According to Officer Copeland, the third right turn the Mercedes made still was within the shopping center parking lot and was not onto Layhill Road as the security guards had said. Also, according to Officer Copeland, the passenger fired the second round of gunshots while the Mercedes was driving south on the parking lot before making a left and then a right out of a different exit into the southbound lane of Layhill Road.

At the outset of the trial, the prosecutor's theory of the case - - as explained in opening statement - - was that, in retaliation for his run-in with Jermaine earlier that night, Sequeira drove his car through the parking lot while Brown shot at the three security guards. At the close of the State's case-in-chief, the prosecutor *nol prossed* the conspiracy to commit attempted first-degree murder counts. The defendants moved for judgments of acquittal on the remaining charges, arguing that the evidence was legally insufficient to show that either one of them had acted with an intent to kill or to frighten or harm Jermaine, Desmond, or Jacobs. They maintained that if the court granted judgments of acquittal on the attempted murder and first-degree assault counts, the use of a firearm count would fail as a matter of law because there could not be a conviction for a predicate crime.

The prosecutor countered that even though all the first-degree assault counts in the indictments named the security guards as victims, reasonable jurors could find that Sequeira and Brown had committed first-degree assaults against Hall and Powell. Therefore, if the defendants were found not guilty of the attempted murder and first-degree assault counts, they still could be found guilty of the use of a firearm count, as it did not specify a victim. The prosecutor emphasized that there was ample evidence that Brown had fired a weapon in the parking lot and that Sequeira had acted as his accomplice and co-conspirator. And, regardless of the targets of the shooting, Brown's conduct was an assault of the attempt-to-frighten variety, committed with a firearm, making it a first-degree assault. *See* Md. Code (2002, 2012 Repl. Vol.), § 3-202(a)(2) of

the Criminal Law Article ("CL") (it is a first-degree assault to "commit an assault with a firearm").

The court denied the motions on the assault and use of a firearm counts and reserved ruling on the attempted murder counts.

Sequeira called the restaurant patron he had seen Jermaine speaking to that night. She testified that Jermaine behaved aggressively toward Sequeira, not the other way around, and that Sequeira never said anything about shooting during that encounter. Brown called a private investigator who had taken measurements in the parking lot. The State did not present a rebuttal case.

At the close of the evidence, the court granted motions for judgment of acquittal on all the attempted murder counts and denied the renewed motions for judgment of acquittal on the remaining charges. Accordingly, the jury would receive for decision three counts of first-degree assault (each naming one security guard), three counts of conspiracy to commit that crime (same), one count of use of a firearm in the commission of a felony or crime of violence (no victim named), and one count of conspiracy to commit that crime (same).

In a discussion about the proposed verdict sheet for each defendant, defense counsel again raised the issue of the viability of the use of a firearm count should the jurors acquit Sequeira and/or Brown on the first-degree assault counts.[9] On behalf of both defendants, Brown's lawyer moved to amend the proposed verdict sheets (one for each

_____

[9]First degree assault is a felony and a crime of violence. *See* CL § 3-202(c); Md. Code (2011 Repl. Vol., 2018 Supp.), § 5-101(c)(3) of the Public Safety Article ("PS").

-9-

defendant) so that if they found the defendant not guilty on the first-degree assault counts, the jurors would "be instructed and by operation of the [verdict] sheet to go no further and not to give a verdict [on the use of a firearm count and the conspiracy to use a firearm count]."

Once again, the prosecutor took the position that the jurors could find the defendants guilty of use of a firearm if they found that a first-degree assault was committed against another victim, such as Hall or Powell. "And if [the jurors] find that a first-degree assault was committed, just not against [any of the security guards] . . . the jury can still find that [the defendants] used a handgun in a crime of violence." Brown's lawyer responded that the defendants were not charged with first-degree assault against anyone other than the security guards "so there would be no underlying conviction."

The court asked, "how would we know whether [the jurors] have found that [the defendants] have committed a crime of violence if that's not on the verdict sheet against anyone . . . [?]" The prosecutor responded that the jurors simply had to find the elements of first-degree assault beyond a reasonable doubt, and the identity of the victim is not one of the elements. If they were to return a verdict of not guilty on the first-degree assault counts, all of which named a victim, and guilty on the use of a firearm count, which did not, then it would be clear that "they found persuasive the evidence and the argument that a first-degree assault was being committed, just not against the victims named in the indictment as to the other counts. There are no named victims or named crime in the [use

of a] handgun count." Ultimately, the court denied the motion to amend the proposed verdict sheets.[10]

The court and counsel moved on to jury instructions. The parties agreed that the court should give the pattern instructions on the intent to frighten and attempted battery varieties of second-degree assault, Maryland Criminal Pattern Jury Instruction ("MPJI-Cr.") 4:01, as well as the first-degree assault instruction that specifies that committing an assault with a handgun is a first-degree assault. *See* MPJI-Cr. 4:01.1A. Brown's lawyer pointed out that there were spaces in the second-degree assault instruction in which the "(name)" of the victim was to be inserted.[11] He asked the court to insert "Jermaine,

---

[10]Before the ruling, the prosecutor argued that, under *Crispino v. State*, 417 Md. 31 (2010), the jurors were not required to unanimously decide "what theory or what modality of commission is utilized." In other words, some of the jurors could find there had been a first-degree assault against one of the victims named in the indictment and others could find there had been a first-degree assault against Hall or Powell. So long as they were unanimous that a first-degree assault was committed, they could convict the appellant and Brown on the use of a handgun counts. After counsel for Brown and the prosecutor traded remarks over whether *Crispino* had any application, and the court read that case, the court denied the motion to amend the verdict sheet. Neither side raises the *Crispino* argument on appeal.

[11]The intent to frighten second-degree assault instruction reads:

Assault is intentionally frightening another person with the threat of immediate [offensive physical contact] [physical harm]. In order to convict the defendant of assault, the State must prove:
(1) that the defendant committed an act with the intent to place (name) in fear of immediate [offensive physical contact] [physical harm];
(2) that the defendant had the apparent ability, at that time, to bring about [offensive physical contact] [physical harm]; and
(3) that (name) reasonably feared immediate [offensive physical contact] [physical harm]; [and]
[(4) that the defendant's actions were not legally justified.]

(continued…)

-11-

Desmond, or Jacobs" in the spaces. The prosecutor disagreed, arguing that the word

"victims" should be inserted in the spaces for "(name)" and commenting that the verdict

sheet would specify the victims named in the first-degree assault counts in the indictment.

She added, "if the Court agrees with the State that we can argue use of a firearm even in

light of an acquittal on the counts particularizing [Jermaine], [Desmond], and Jacobs [as

victims], then the jury still needs to be instructed on what it means to commit a first-

degree assault[.]" The court decided the issue in favor of the State, and inserted the word

"victims" in the instruction instead of inserting the security guards' names. The assault

instruction as given was:

> The defendants are charged with the crime of assault. Assault is intentionally frightening another person with the threat of immediate . . . offensive physical contact or physical harm. In order to convict the defendants of assault, the State must prove that the defendants committed an act with the intent to place ***victims*** in fear of immediate offensive physical contact or physical harm, that the defendants had the apparent ability at that time to bring about offensive physical contact or physical

___

(…continued)

MPJI-Cr. 4:01A (emphasis in original). The attempted battery second-degree assault instruction provides:

> Assault is an attempt to cause [offensive physical contact] [physical harm].
> In order to convict the defendant of assault, the State must prove:
> (1) that the defendant actually tried to cause immediate [offensive physical contact with] [physical harm to] (name);
> (2) that the defendant intended to bring about [offensive physical contact] [physical harm]; and
> (3) that the defendant's actions were not consented to by (name) [or not legally justified].

MPJI-Cr. 4:01B (emphasis in original).

harm, and that *the victims* reasonably feared immediate offensive physical contact or physical harm.

Assault is an attempt to cause offensive physical contact or physical harm. In order to convict the defendants of assault, the State must prove the defendants actually tried to cause immediate offensive physical contact or physical harm to *the victims*, that the defendants intended to bring about offensive physical contact or physical harm, and that the defendants' actions were not consented to by *the victims*.

The defendants are charged with the crime of first-degree assault. In order to convict the defendants of first-degree assault, the State must prove all of the elements of second-degree assault and also must prove that the defendants used a firearm to commit assault. . . .

(Emphasis added).

The court also instructed the jurors that the defendants were charged with "use of a firearm in the commission of a felony crime of violence," that the "felony crime of violence in this case is assault in the first degree[,]" and that to convict on the use of a firearm count, "the State must prove that the defendants used a firearm in the commission of an assault in the first degree."

After the court finished instructing the jury, counsel approached the bench and the court asked, "Anything else?" Brown's lawyer objected to an instruction on concealment and flight and to an accomplice liability instruction. Sequeira's lawyer objected to the "[s]ame exact thing[,] . . . flight, concealment, accomplice liability" and also to a non-pattern instruction on conspiracy. Counsel for Brown joined in the objection to the conspiracy instruction. The prosecutor said she was satisfied with the instructions.

Before the lunch recess, the court asked counsel if "everyone had a chance to look at the verdict sheets?" Counsel for Brown replied, "Yes." The trial judge said they could

"talk about that," if necessary, before the case was sent to the jury. Sequeira's lawyer replied, "Thank you."

In closing argument, the prosecutor noted that it was undisputed that shots were fired by someone inside the Mercedes and that that amounted to use of a handgun. Predicting that defense counsel would argue that the jurors "can't find these men guilty of shooting at Jermaine, [Jacobs], and Desmond because they were, in fact, actually shooting at William Powell and Rashad Hall[,]" she argued that, although that was a defense to the first-degree assault counts, all of which named a security guard as a victim, it was not a defense to the use of a firearm counts, "because if you're committing a first-degree assault on either Rashad Hall or William Powell, well that's still a crime of violence for use of a firearm."

After closing arguments, none of the parties asked to revisit the verdict sheets. The case was sent to the jury that afternoon.

The verdict sheet for each defendant listed the counts remaining for decision in order but renumbered them. For Sequeira's verdict sheet, for Counts One and Four, the jurors were asked whether they found Sequeira not guilty or guilty of first-degree assault against Jermaine and conspiracy to commit first-degree assault against Jermaine. That pattern repeated itself for Counts Two and Five (first-degree assault and conspiracy to commit first-degree assault against Desmond) and Counts Three and Six (first-degree assault and conspiracy to commit first-degree assault against Jacobs). There was no question asking whether the jurors found the defendant guilty of first-degree assault and conspiracy to commit first-degree assault against anyone else.

The final two questions on the verdict sheet read:

**COUNT 7: USE OF A FIREARM IN THE COMMISSION OF A CRIME OF VIOLENCE AND/OR FELONY**
(Previously Count 13)

As to Count 7, use of a firearm in the commission of a crime of violence and/or felony, we the jury find the Defendant:

_____          _____
NOT GUILTY              GUILTY

**COUNT 8: CONSPIRACY TO USE A FIREARM IN THE COMMISSION OF A CRIME OF VIOLENCE AND/OR FELONY**
(Previously Count 14)

As to Count 8, conspiracy to use a firearm in the commission of a crime of violence and/or felony, we the jury find the Defendant:

_____          _____
NOT GUILTY              GUILTY

The verdict sheet for Brown was the same.

The jurors deliberated and returned a verdict the next day. They found Sequeira guilty of conspiracy to commit first-degree assault against Jermaine, which is not a felony or crime of violence[12]; use of a firearm in the commission of a felony or crime of violence; and conspiracy to use a firearm in the commission of a felony or crime of violence. They acquitted him on all other counts, including the three first-degree assault counts. The jurors found Brown guilty of use of a firearm in the commission of a felony or crime of violence and conspiracy to commit that crime and acquitted him on all other

---

[12]*See Rudder v. State*, 181 Md. App. 426, 436 (2008) ("Conspiracy is a . . . common law misdemeanor[.]"); *Townes v. State*, 314 Md. 71, 75 (1988) ("A conspiracy to commit a crime exists as an offense separate and distinct from the substantive crime that is the object of the conspiracy."); PS § 5-101(c) (defining a crime of violence to include first- and second-degree assault and an attempt to commit those crimes).

counts, including the three first-degree assault counts and conspiracy to commit first-degree assault against Jermaine. No objection was raised before or after the jurors hearkened to their verdict and were dismissed.

Sequeira filed a timely motion to vacate or for new trial. He argued that his conviction for conspiracy to commit first-degree assault against Jermaine could not stand because Brown, the only other alleged conspirator, was acquitted on that count. *See Hurwitz v. State*, 200 Md. 578, 592 (1952) (adopting the "rule of consistency," that is, "[a]s one person alone cannot be guilty of a conspiracy, when all but one conspirator are acquitted, conviction of the remaining conspirator cannot stand"). He also argued that because he had been acquitted on all the first-degree assault counts, he had not been convicted of a felony or crime of violence, and therefore the use of a firearm conviction could not stand. Finally, he argued that the evidence was legally insufficient to sustain his convictions.

The State conceded that Sequeira's conviction for conspiracy to commit first-degree assault against Jermaine had to be set aside. It argued that his conviction on the use of a firearm count was not legally inconsistent with his acquittals on the first-degree assault counts against Jermaine, Desmond, and Jacobs because the evidence was legally sufficient to prove the elements of first-degree assault perpetrated against Hall and Powell. The State also argued that Sequeira had waived any inconsistent verdict argument by not immediately raising it before the jurors were discharged.

The court vacated Sequeira's conviction for conspiracy to commit first-degree assault against Jermaine but otherwise denied his motion. Sequeira noted this timely appeal[13], presenting two questions, which we have rephrased:

> I. Was Sequeira properly convicted of and sentenced for use of a firearm in the commission of a felony or crime of violence and conspiracy to use a firearm in the commission of a felony or crime of violence given that he was not convicted of any underlying felony or crime of violence?
>
> II. Was trial counsel ineffective for failing to object to certain *voir dire* questions?

We answer Question I in the negative and, given our disposition, do not address Question II.

## DISCUSSION

### I.

#### (a)

Sequeira contends the trial court committed several errors that culminated in his being convicted of use of a firearm without being convicted of the predicate crime of first-degree assault, and that such a conviction, and his conspiracy conviction, cannot stand. He advances several arguments in support:

- The court erred by denying his motion to include an order of deliberation instruction in the verdict sheet and, relatedly, by erroneously instructing the jurors so as to permit them to convict him of use of a firearm even if they acquitted him of first-degree assault;

---

[13]Brown noted an appeal to this Court, but voluntarily dismissed it on July 29, 2020. *See Quinnton Brown v. State of Maryland*, No. 1946, Sept. Term 2019.

- The court violated his due process rights by allowing the State to pursue the theory that he committed a first-degree assault against victims other than those named in the indictment, without his being given notice of that until midway through the trial;

- His sentences for use of a firearm and conspiracy to use a firearm are illegal because he was not charged with either crime against Hall or Powell;

- The evidence was legally insufficient to convict him of use of a firearm as an accomplice to Brown because there was no proof that he had advance knowledge that Brown was armed; and

- The evidence was legally insufficient to convict him of conspiracy to commit first-degree assault against Hall and Powell because there was no proof that he had conspired with Brown to commit that crime against Hall and Powell.

In response, the State argues lack of preservation and waiver and, alternatively, lack of merit:

- Sequeira did not preserve and waived his order of deliberation argument by not objecting after the court instructed the jury and approved the verdict sheet. In any event, the court properly declined to give an order of deliberation instruction because the use of a firearm count did not identify a specific victim and the evidence permitted the jurors to acquit Sequeira on the first-degree assault counts and convict him on the use of a firearm count.

- To the extent Sequeira is making an argument based on inconsistent verdicts, he waived that argument by not objecting before the jurors were discharged. In any event, the verdicts were not inconsistent.

- The appellant's due process argument is an allegation of a defect in the indictment that he did not raise before trial or by motion to dismiss the use of a firearm count during trial, thereby forfeiting his right to raise the issue on appeal. If addressed, the indictment was not defective for failure to name a victim in the use of a firearm count.

- The evidence was legally sufficient to convict the appellant of use of a firearm and conspiracy to commit that crime and the sentences imposed are not illegal.

**(b)**

CL section 4-204, entitled "Use of firearm in commission of crime," states at subsection (b) that a person may not,

> use a firearm in the commission of a crime of violence, as defined in § 5-101 of the Public Safety Article, or any felony, whether the firearm is operable or inoperable at the time of the crime.

A "firearm" includes a handgun. CL § 4-204(a)(2). As noted, first-degree assault is both a felony and a crime of violence under section 5-101(c) of the Public Safety Article.

The elements of use of a firearm, put simply, are (1) the defendant used a firearm; and (2) the defendant did so in the commission of a felony or crime of violence ("predicate crime"). *Hallowell v. State*, 235 Md. App. 484, 507 (2018). Use of a firearm is what is commonly referred to as a "compound crime," that is, a crime that has another crime (that we are calling the predicate crime) as one of its elements. *McNeal v. State*, 426 Md. 455, 468 n.10 (2012).

In Maryland, the offense of use of a firearm was created in 1972, as part of the General Assembly's comprehensive "scheme to curb the commission of violent crimes involving the use of handguns." *Broadway v. State*, 23 Md. App. 68, 75 (1974) (footnote omitted). *See* Ch. 13, Acts 1972 (approved March 27, 1972 and effective from date of passage). The offenses established were codified as Article 27, §§ 36B through 36F, under the subheading "Handguns," with use of a firearm (then denominated use of a handgun), codified as subsection 36B(d). In 2002, with the revision of the Maryland Criminal Code, subsection 36B(d) became CL section 4-204. Minor non-substantive language changes were made over the years, including changing the name of the crime

-19-

from use of a handgun to the more expansive use of a firearm. (For consistency, other than in quotations, we shall refer to the crime as use of a firearm.)

A few years after the legislation creating use of a firearm was enacted, the Court of Appeals addressed the interplay between the predicate crime (or crimes) on which a use of a firearm conviction is based and the use of a firearm offense itself. In *Ford v. State*, 274 Md. 546 (1975), the defendant was charged by multicount indictment with several crimes, including use of a firearm, all arising out of the armed robbery of a taxi driver. At trial, the crimes of robbery with a dangerous and deadly weapon, robbery, assault, and use of firearm were sent to the jury for decision. The jury acquitted the defendant of all crimes except use of a firearm, on which it convicted him.

Before the Court of Appeals, the defendant offered two arguments as to why his conviction could not stand. First, he read language in section 36B(d) directing that a defendant found guilty of use of a firearm be sentenced for that crime "in addition to any other sentence imposed by virtue of commission of said felony [or crime of violence]" to mean that a defendant only could be sentenced for use of a firearm if he also was sentenced for the predicate felony or crime of violence. Therefore, he argued, a defendant only could be sentenced for use of a firearm if also convicted of the predicate crime, as one cannot be sentenced without being convicted. Second, the acquittals on all the predicate crimes negated an element of the use of a firearm crime, and therefore the evidence was legally insufficient to support his conviction, and the convictions were inconsistent.

-20-

The Court rejected both arguments. On the first, which is most relevant to the case at bar, the Court explained that, although the statute "requires the trier of fact to determine beyond a reasonable doubt, from the evidence, that the [defendant] used a handgun during the commission of either a felony or crime of violence as a prerequisite to being convicted of" use of a firearm, the statutory language makes clear that the use of a firearm offense is separate from the predicate offense. *Id*. at 550-51. Accordingly, a defendant convicted of use of a firearm does not need to have been charged with, and therefore does not need to have been convicted of, the predicate crime:

> [A]n individual on trial for the [use of a firearm] charge does not necessarily need to have been separately accused of the commission of a felony or crime of violence in an additional count or indictment before he can be charged with or convicted of the [use of a firearm crime].

*Id*. at 551. The Court interpreted the sentencing language in section 36B(d) to mean that, when the predicate crime *is* charged and the jury convicts on both crimes, the sentence for use of a handgun must be in addition to the sentence for the predicate crime.

On the second argument, the Court held, in conformity with the then-existing law on inconsistent verdicts in criminal cases, that an acquittal of the predicate crime that is inconsistent with a finding of guilt of the use of a firearm crime will stand because the jury considers them separately.

In the years after *Ford* was decided, the Maryland appellate courts developed a body of case law concerning inconsistent verdicts returned in cases tried on predicate crimes charged with use of a firearm. Generally, inconsistent verdicts by juries in criminal cases were accepted. In *Mack v. State*, 300 Md. 583, 597 (1984), the Court,

-21-

recognizing that a jury's acquittal of the predicate crime and conviction of use on a firearm is legally inconsistent, held that, to "minimize the possibility of inconsistent verdicts" being returned by juries when multicount indictments are tried, an order of deliberation instruction must be given, if requested. *See also State v. Williams*, 397 Md. 172, 189 (2007) ("It has been the position of this Court that inconsistent verdicts in jury trials are permissible in criminal cases") (footnote omitted). The *Mack* Court further held that trial courts have discretion to set aside inconsistent verdicts of guilt.

Inconsistent verdicts in bench trials were not acceptable, however. *Shell v. State*, 307 Md. 46, 55-56 (1986) (inconsistent acquittal on predicate crime of violence and conviction of use of a firearm will not be tolerated in a bench trial); *Williams v. State*, 117 Md. App. 55, 69-71 (1997) (where defendant had been convicted of assault with intent to maim and use of a firearm in the commission of a felony or crime of violence, and the assault conviction was vacated on appeal because of an instructional error, the appellate court was required to vacate the use of a firearm conviction as well, to avoid a court producing inconsistent verdicts).

In *Price v. State*, 405 Md. 10 (2008), the Court of Appeals changed Maryland common law to hold that, in most circumstances, inconsistent jury verdicts in criminal cases are not acceptable. *Price* did not involve the crime of use of a firearm but did involve another compound crime: possessing a firearm under sufficient circumstances to constitute a nexus to a drug trafficking crime. *See* CL § 5-621(b)(1). A jury had acquitted the defendant of the charged drug trafficking crime and had convicted him of the possessing a firearm crime. The Court reversed the possessing a firearm conviction, and

expressly overruled *Ford*, *Mack*, and *State v. Williams*, on the issue of inconsistent verdicts in criminal jury trials.

In a concurring opinion, Judge Harrell proposed limits on the change to Maryland common law, including that the rejection of inconsistent jury verdicts in criminal cases be confined to *legally* inconsistent verdicts and not apply to *factually* inconsistent verdicts. *Id.* at 35-38. (In *McNeal*, 426 Md. at 459, the Court adopted that suggestion.) He also advocated for the change not to apply to inconsistent jury verdicts rendered in separate trials, drawing a comparison to an exception to the "rule of consistency" in criminal conspiracy cases that excludes conspiracy verdicts rendered by different juries in separate trials. *Id.* at 38 (citing *Gardner v. State*, 286 Md. 520, 524-25 (1979), and *State v. Johnson*, 367 Md. 418, 430 (2002)). Consistent with *Gardner*, Judge Harrell pointed out that the State need not charge more than one conspirator, and drew this comparison:

> As a parallel, the Majority's opinion should not be read to require that the State even charge an underlying offense in order to maintain "consistency." Thus, Price could be convicted of possession of a handgun with a nexus to drug trafficking without being charged and tried for drug trafficking.

*Id.*[14]

---

[14]In *Gardner*, the Court of Appeals stated, with respect to a charge of conspiracy:

[W]hile the evidence at the trial of a conspirator must show that he and at least another are guilty of forming an illegal scheme, it is not necessary that more than one person be convicted . . . . The rule of consistency has been held not to apply when A has been convicted of conspiracy and B has been granted immunity, or when B is dead, unknown, untried, unapprehended, or unindicted. In these and other situations in which there has been no judicial determination of the guilt or innocence of the alleged co-conspirators, i.e.,

(continued…)

-23-

Maryland's body of case law on inconsistency between a jury's guilty verdict on the offense of use of a firearm and not guilty verdict on the predicate crime, as developed from *Ford* until *Price*, did not include any case in which a defendant was convicted of use of a firearm based on an uncharged predicate crime. This is easily explained, as there would be no inconsistency in such a verdict. More broadly, however, we have found no reported cases presenting such a procedural posture that were decided by either appellate court in that time frame (or since). Nevertheless, we take guidance from *Manigault v. State*, 61 Md. App. 271 (1985), which involved charged *and* uncharged predicate crimes.

Manigault fired a handgun at two victims, missing one and striking and injuring the other. The grand jury presented two multicount indictments against him, one for each victim. In both, the "flagship" first count was assault with attempt to rob, followed by counts for assault, carrying a handgun, and use of a firearm in the commission of a felony or crime of violence. *Id*. at 275. In both indictments, the flagship count identified a victim and time and place of the predicate crime and the final three counts did not. The indictments were identical except for the names of the victims.

At trial, at the close of the State's case-in-chief, the defense moved for judgments of acquittal on the flagship assault with intent to rob counts because there was no evidence of an intent to rob. Only then did the prosecutor realize that due to a mistake in

(…continued)
no adjudication on the merits, there is nothing incongruous or inconsistent about convicting a sole defendant if there is sufficient evidence of the conspiracy.

286 Md. at 524-25 (citations omitted).

-24-

drafting the indictments, Manigault had been charged with assault with intent to rob instead of assault with intent to murder. The State had adduced evidence of intent to murder but had not adduced evidence of intent to rob, or anything to do with robbery, as no such evidence existed. The motions were granted. The jury convicted Manigault of simple assault, carrying a handgun, and use of a firearm in the commission of a felony or crime of violence against each victim. The first two convictions were not felonies or crimes of violence.

Manigault appealed, arguing that the verdicts were inconsistent. The State responded that because there was legally sufficient evidence to support a finding of guilt beyond a reasonable doubt on the uncharged crimes of assault with intent to murder, the jurors could have found that Manigault had committed a predicate crime against each victim and therefore the use of a firearm convictions were not inconsistent with the acquittals on the charged crimes of assault with intent to rob.

We reversed the use of a firearm convictions, but not on the ground of inconsistent verdicts, which still were permitted in jury trials in criminal cases at that time. We concluded that, in both indictments, the use of a firearm counts implicitly charged use of a firearm in the commission of the charged crime of assault with intent to rob. We explained,

> With these two indictments, as with most multi-count indictments, the various lesser included and other more or less related counts take on coloration from the 'flagship count.' *It is the 'flagship count' that gives the entire indictment its name and its identity.*

61 Md. App. at 275. (Emphasis added). Given that, although not expressly stated in the indictments, the use of a firearm counts charged use *in the commission of the crime of assault with intent to rob*, the convictions could not stand because assault with intent to rob was an element of the use of a firearm crimes and the evidence was legally insufficient to support a finding against the defendant on that element. Regardless of the outcome on the flagship counts, the use of a firearm counts failed of their own accord, for insufficient evidence.

A case decided after *Price* is helpful as well. In *Hallowell v. State*, 235 Md. App. 484 (2018), the defendant shot and killed a person during a drug dealing dispute. He was charged with first-degree murder and use of a firearm in the commission of a felony or crime of violence. A jury acquitted him of first-degree murder but hung on the lesser included offense of second-degree murder and on use of a firearm. A mistrial was declared. The State retried the defendant for second-degree murder and use of a firearm. The court instructed the jury on two forms of second-degree murder: specific intent murder and second-degree felony murder. The felony for purposes of felony murder was the uncharged crime of first-degree assault.[15] The jury convicted on second-degree murder, without specifying the type, and use of a firearm.

On appeal, the defendant argued, and the State conceded, that the second-degree murder conviction had to be vacated under *State v. Jones*, 451 Md. 680, 696 (2017),

---

[15]When charging felony murder, the State does not have to charge the defendant with the predicate felony. *Kohler v. State*, 203 Md. App. 110, 119 (2012).

reported during the interval after the trial and before the appeal. The *Jones* Court held that when an assaultive act is committed as part of a murder, assault cannot serve as the underlying felony for second-degree felony murder under the merger doctrine.[16] That doctrine holds that a felony that is an integral element of the homicide itself cannot be the underlying felony for purposes of second-degree felony murder. Because the second-degree murder conviction was on a general verdict, it was impossible to rule out second-degree felony murder as its basis. We therefore vacated the judgment for second-degree murder.

We then turned to the question whether the use of a firearm conviction could stand without the second-degree murder conviction. In the context of the case, the elements of use of a firearm were (1) the defendant used a firearm, and (2) he did so in the commission of murder in the second degree. Quoting *Ford v. State*, *supra*, the State maintained that because use of a firearm and the predicate crime are separate offenses, it did not need to charge and convict the defendant of first-degree assault to convict him of use of a firearm in the commission of a felony or crime of violence. The State argued that the jurors necessarily found that Hallowell had committed a felony or crime of violence: either they found him guilty of specific intent second-degree murder, which is a felony and crime of violence, or they found him guilty of second-degree felony murder by committing first-degree assault (the only predicate crime they were instructed on), which also is a felony and crime of violence. Because either way, the jurors found that

---

[16]The holding in *Jones* overruled *Roary v. State*, 385 Md. 217 (2005).

Hallowell had committed a felony/crime of violence, they had found the elements of use of a firearm.

Noting that the argument had some appeal at first blush, we concluded that it did not withstand analysis. It "ignore[d] that [Hallowell] was never actually charged with first-degree assault and, therefore, was not and could not have been convicted of that offense. Indeed, upon vacatur of [his] conviction for second-degree murder, he does not stand convicted of a predicate felony or crime of violence." 235 Md. App. at 509. In other words, the indictment, which charged first-degree murder, the lesser included offense of second-degree murder, and use of a firearm, was fashioned so that, if there were an acquittal on the first-degree murder charge, the use of a firearm charge would be based on the commission of the remaining crime of violence - - second degree murder. Accordingly, upon vacation of the second-degree murder conviction, the use of a firearm conviction had to be vacated as well.

The holdings in *Maginault* and *Hallowell* are consistent with each other and are not inconsistent with the Court of Appeals' observation in *Ford*, Judge Harrell's concurring opinion in *Price*, or the language of the use of a firearm statute. As relevant, the statute merely provides that "[a] person may not use a firearm in the commission of a crime of violence. . . or any felony[.]" CL § 4-204(b). It does not say that the person in question must be convicted of committing the felony/crime of violence to be found guilty. That supports the remarks by the *Ford* Court and by Judge Harrell in his concurring opinion in *Price* that a defendant charged with a compound crime need not be charged with the predicate crime at all.

By contrast, in *Manigault* and *Hallowell* (and here), the defendants were not charged with use of a firearm in a vacuum, that is, without being charged with *any* predicate crime. They were charged with use of a firearm *and* with predicate crimes. As Judge Moylan explained in *Manigault*, multicount indictments function as a unit, with the lower counts taking their identities from the lead count. The charges against Manigault for use of a firearm took their meaning from the flagship assault with intent to rob count, and the absence of evidence of intent to rob meant there was an absence of evidence that a firearm was used in the commission of an assault with intent to rob. Because the multicount indictments were units, it did not matter that there was evidence adduced that could support the uncharged crime of assault with intent to murder.

Likewise, in *Hallowell*, after the acquittal on first-degree murder, the indictment, as a unit, charged use of a firearm in the commission of second-degree murder (a lesser included offense of the charged first-degree murder) - - and not in the commission of an uncharged first-degree assault. As we explained, once the second-degree murder conviction was vacated, there was no conviction for a predicate crime to support the use of a firearm conviction. It did not matter that the jurors could have found that Hallowell had committed the uncharged felony of first-degree assault. *See Cordovi v. State*, 63 Md. App. 455, 471 (1985) (multicount indictment "must be read in its entirety, not as a series of unconnected counts"; indictment was sufficient because overlapping factual allegations in the lead count of second-degree rape and the lower count of second-degree sexual offense compelled the conclusion that the mode of commission of the crimes was the same, even though not specified); s*ee also Rudder v. State*, 181 Md. App. 426, 453

-29-

(2008) (with multicount indictment, in the event of doubt as to which substantive count a single conspiracy count relates, there is a rebuttable presumption that it relates to the flagship, most serious, count); *People v. Johnson*, 595 N.E.2d 1381, 1390 (Ill. App. 1992) (upholding multicount indictment because lead counts of physical aggravated battery against individual nursing home residents were sufficient to inform defendant that subsequent count for statutory crime of abuse of a long-term facility resident was predicated on acts of physical, not mental or sexual, abuse).

We conclude from these cases that, when, by multicount indictment, the State charges a defendant with a lead felony/crime of violence count (or counts) and with use of a firearm in the commission of a felony/crime of violence, and it is not facially evident that the use of a firearm crime stemmed from an entirely separate incident, the indictment operates as a whole, and the predicate crime for the compound crime of use of a firearm takes its meaning from the lead counts. In that circumstance, the State may not rely upon proof of an uncharged predicate crime to support a conviction for use of a firearm.

Our conclusion is bolstered by Maryland case law on double jeopardy. In *State v. Ferrell*, 313 Md. 291 (1988), Ferrell and some accomplices robbed Sam Smith and others on a school playground. One of the accomplices used a handgun during the robbery. Ferrell was charged in a multicount indictment with armed robbery of Smith and other victims. The day before trial, during plea negotiations, the prosecutor realized that by oversight the indictment did not include any use of a firearm counts. He immediately filed a criminal information separately charging Ferrell with use of a handgun based on the same factual allegations. The armed robbery case was called for trial the next day and

in short order the parties agreed that Ferrell would plead guilty to armed robbery of Sam Smith, conditioned upon the State's *nol prossing* all other charges against him and the court's accepting a recommended sentence not to exceed three years.

After the court accepted the plea but before sentencing, Ferrell was arraigned on the information charging him with use of a firearm. He filed a motion to dismiss on the ground that the prosecution was barred by the Double Jeopardy Clause of the Fifth Amendment to the federal constitution. Ferrell then was sentenced favorably in the armed robbery case. Thereafter, the court, by another judge, granted the motion to dismiss the information charging use of a firearm. The State appealed.

The case reached the Court of Appeals, which affirmed. It based its decision on the required evidence test of *Blockburger v. United States*, 284 U.S. 299 (1932). It held that under that test, the crimes of armed robbery of Sam Smith, to which Ferrell had pled guilty, and use of a firearm in the commission of a crime of violence, for which he then was being prosecuted, were the same, because the armed robbery crime was an element of the use of a firearm crime. Thus, having been formerly convicted, Ferrell could not be tried for what, for federal Double Jeopardy purposes, was the same crime. The *Ferrell* Court pointed out that the State could have avoided the Double Jeopardy prohibition. Instead of entering into a plea bargain, it could have *nol prossed* the multicount armed robbery indictment and re-indicted Ferrell for all the armed robbery counts and for use of a handgun; or it could have moved to consolidate the armed robbery indictment with the use of a handgun information. What it could not do was obtain a conviction for the

predicate offense and subsequently try Ferrell for the use of a firearm offense that embodied it.

The *Ferrell* holding makes plain that when a predicate crime has been charged based on an incident in which a firearm was used in committing the crime, the use of a firearm crime tied to that predicate crime is not a free agent that can attach to whatever uncharged predicate crime might happen to be proven at trial. The predicate crime and associated use of a firearm crime are linked.

**(c)**

We now turn to address how the law we have discussed above affects the various issues Sequeira has raised on appeal, to the extent they are preserved for review and are not obviated by each other or rendered moot.

In the multicount indictment against Sequeira, three flagship counts charged him with attempted first-degree murder. They were followed, in descending order of severity, by three counts each of conspiracy to commit first-degree murder, first-degree assault, and conspiracy to commit first-degree assault, and finally by one count of use of a firearm and one count of conspiracy to use a firearm. All the counts alleged that the crimes took place on December 1, 2018, in Montgomery County, and all the counts except the use of a firearm and related conspiracy counts specified the name of a victim. Applying the law on unity of operation of a multicount indictment, the only logical interpretation of those last two counts is that the felonies/crimes of violence Sequeira allegedly was committing when he used a firearm were the attempted murders of and first-degree assaults against the three security guards. The use of a firearm count took its

identity from the lead and superior counts in the indictment, all of which specified the security guards as the victims of the predicate crimes Sequeira was alleged to have committed. It was implicit in the use of a firearm count that the victims of that crime were the three security guards.

As the State points out, it could have charged Sequeira with three counts of use of a firearm, instead of one, because the unit of prosecution for that crime is the predicate felony/crime of violence committed. *See Garner v. State*, 442 Md. 226, 242 (2015). It is clear from *Ferrell*, however, that Sequeira no longer can be prosecuted for the additional two counts of use of a firearm that could have been included in the multicount indictment but were not. The use of a firearm count that was charged related to the three predicate crimes that went to the jury. (Conversely, the State did not charge Sequeira with first-degree assault against Hall and Powell and the use of a firearm crimes that would be attendant to those charges.) What the State sought to accomplish, when the prosecutor sensed that the predicate crimes against Sequeira for assaulting the security guards were on thin ice due to conflicts in the evidence, was to save its case by "mixing and matching" potential, uncharged predicate crimes with the charged use of a firearm crime. The unity of operation of a multicount indictment does not permit that.

Sequeira maintains the trial court erred by not including an order of deliberation instruction in the verdict sheet and by instructing the jurors so as to allow them to find him guilty of use of a firearm even if they found him not guilty of first-degree assault

against any of the security guards.[17] As stated above, the State maintains that these issues are not preserved for review or were waived because defense counsel did not object after the court instructed the jury and made its decision about the verdict sheet.

Almost immediately before the jury was instructed, Sequeira's counsel (either directly or in tandem with Brown's counsel) made his request and position plain. First, he was seeking an instruction within the verdict sheet itself directing the jurors that if they were to find him not guilty on the first-degree assault counts, they had to find him not guilty on the use of a firearm count. Second, defense counsel sought to insert the names of the three security guards in the place provided for the victim's name in the pattern first-degree assault instruction. In both instances, the prosecutor opposed the request on the ground that the jurors could find that Sequeira committed a first-degree assault against Hall or Powell (or both); find in his favor on the first-degree assault counts, each of which named a security guard as a victim; and, notwithstanding those not guilty verdicts, find him guilty of use of a firearm in the commission of a felony or crime of violence based on a first-degree assault against Hall and/or Powell. She opposed including order of deliberation language in the verdict sheet and inserting the names of the security guards in the first-degree assault instruction because both would prohibit the jurors from basing a guilty verdict for use of a firearm on a finding that Sequeira had committed a first-degree assault against Hall and/or Powell instead of on a finding that he

---

[17]As noted, judgments of acquittal had been granted on the attempted first-degree murder counts and the State had *nol prossed* the related conspiracy counts.

had committed a first-degree assault against one, some, or all of the security guards named in the indictment.

Defense counsel's requests and the prosecutor's opposition to them were addressed at length by the court and counsel. Sequeira's lawyer first made his position clear during argument on the motions for judgment of acquittal, when he asserted that the evidence did not support the charges of attempted first-degree murder, first-degree assault, or conspiracy to commit first-degree assault against the security guards and that, if the court granted his motion on those charges, "the handgun charges[] . . . would fall as well." The prosecutor disagreed, maintaining that the use of a handgun charge could be sustained upon proof that a first-degree assault was committed against Hall and/or Powell. Counsel for Brown and Sequeira again raised this argument during discussion of the verdict sheet and then during discussion of the assault instruction. The court denied the requests, fashioning the verdict sheet and the assault instruction to support the State's theory - - later presented to the jurors in closing argument - - that Sequeira could be found to have committed a first-degree assault against Hall and/or Powell, and such a finding would support a guilty verdict for use of a firearm.

As the State points out, defense counsel did not repeat these arguments in an objection after the court instructed the jury, as Rule 4-325(e) requires. In his reply brief, Sequeira argues that he substantially complied with the requirements of that Rule.

As relevant, Rule 4-325(e) prohibits a party from raising on appeal trial court error in giving or failing to give an instruction "unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects

-35-

and the grounds of the objection[.]" The purpose of this requirement is "to give the trial court an opportunity to correct its charge if it deems correction necessary[.]" *Gore v. State*, 309 Md. 203, 209 (1987).

This Court and the Court of Appeals have recognized that circumstances may exist in which a party did not strictly comply but substantially complied with the requirement to lodge a post-instructions objection. In *Gore v. State*, *supra*, the Court set forth the conditions that must exist for there to be substantial compliance with Rule 4-325(e): "there must be an objection to the instruction; the objection must appear on the record; the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record and the circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless." 309 Md. at 208 (citing *Bennett v. State*, 230 Md. 562 (1962)).

More recently, in *Watts v. State*, 457 Md. 419 (2018), the Court explained that, "if the record demonstrates the trial court recognizes that an effective objection has been made, the issue has been preserved for appellate review." *Id.* at 428 (citing *Sergeant Co. v. Pickett*, 283 Md. 284, 289 (1978)[18]). *See also Horton v. State*, 226 Md. App. 382, 414

---

[18]*Sergeant v. Pickett*, *supra*, was a civil case, in which Rule 2-520(e) governed objections to instructions. That subsection and Rule 4-325(e) are identical except the latter contains an additional sentence permitting an appellate court to "take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." In *Haney v. Gregory*, 177 Md. App. 504 (2007), also a civil case, Judge Rodowsky, writing for this Court, examined the history of both Rules in concluding that the plaintiff substantially complied with Rule 2-520(e) by objecting to the defendant's proposed sudden emergency instruction in chambers, on the record, before instructions were given, without objecting after instructions were given. Rejecting the defendant's

(continued…)

(2016)(under the factors enumerated in *Gore*, appellant substantially complied with Rule 4-325(e) when, the day before instructions were given, his attorney urged the court to give an accomplice instruction, the judge advised that she would consider the issue overnight, the judge decided the following morning not to give the instruction, and defense counsel did not object after the jury was instructed).

When we apply the holding in *Gore* to the circumstances in this case, we are satisfied that Sequeira substantially complied with Rule 4-325(e), thereby preserving his challenge to the court's instruction on first-degree assault. The court and counsel discussed that pattern jury instruction at length. When the prosecutor made known that the State wanted to insert the word "victims" in the space that calls for the name of the victim, counsel for Sequeira objected. He explained that, as charged in the indictment, the security guards were the only victims of first-degree assault; that a conviction on at least one of the first-degree assault counts against a security guard would be necessary for the jury to convict Sequeira of use of a firearm; and that the word "victims" in the instruction, instead of the security guards' names, would allow the prosecutor to argue, improperly, that a first-degree assault was committed against Hall and/or Powell. One can tell from the court's follow-up questions that the nature of the objection was clear. The

---

(…continued)
argument that an objection made before instructions are given is *per se* ineffective for preservation, Judge Rodowsky said, "[t]hat reading is not required by the purpose of the rule, is inconsistent with the concept of substantial compliance that was recognized under predecessor rules, is not required by the 'legislative' history of Rule 2-520(e), and is inconsistent with the construction by the Court of Appeals of identical language in Rule 4-325(e), which was adopted contemporaneously with Rule 2-520(e)[.]" *Id.* at 510-11.

court just had declined to grant Sequeira's motion to amend the verdict sheet to include order of deliberation language, and the verbiage of the verdict sheet related to the objection about the use of the word "victims" in the first-degree assault instruction. After discussion with counsel, the court retired to chambers to consider the arguments made, and then returned and ruled against Sequeira. The court instructed the jury almost immediately thereafter.

Under the circumstances, there is no reason to believe the court would have changed its mind had an objection been made after the instructions were given. The court knew the positions of the parties, made a definite ruling, and gave no sign that it would reconsider its ruling after instructing the jury. The court also knew that its ruling on the verdict sheet and on the first-degree assault instruction were intertwined, as the State needed favorable decisions on both to be able to put before the jury its theory that Sequeira could be convicted of use of a firearm based on proof of the elements of first-degree assault against Hall and/or Powell. This made it even less likely that the court would have changed its ruling upon hearing an objection based on the very same arguments it had just considered and rejected. The purpose of the post-instruction objection requirement had been accomplished and there was "no reason to repeat in the court room what had already been said and recorded by the reporter in chambers." *Bennett v. State*, 230 Md. at 569.

The circumstances here also make it highly unlikely that Sequeira's counsel deliberately omitted a post-instruction objection to the first-degree assault instruction as a maneuver to gain advantage. That instruction, approved by the court over Sequeira's

objection right before the jury was charged, greatly increased the likelihood that Sequeira would be convicted of use of a firearm. It allowed the State to pursue a theory of prosecution for the use of a firearm charge (predicate assaults were committed against Hall and/or Powell) that up until the close of the State's case Sequeira was using as a defense (if there were assaults, they weren't committed against the security guards). Just as Judge Rodowsky observed in *Haney v. Gregory*, 177 Md. App. 504, 520 (2007), there was "no conceivable tactical reason why [the defendant] would decide, after having distinctly objected to the requested . . . instruction, to forego that objection."

Finally, Rule 4-325 does not govern verdict sheets and there is no separate rule in criminal cases that requires a party to renew an objection to a verdict sheet before it is submitted to the jury.[19] Sequeira did not request an order of deliberation jury instruction separate from the verdict sheet. Instead, he asked that the verdict sheet be crafted so the jurors would know that if they acquitted him of all the first-degree assault counts, they could not find him guilty of the use of a firearm count. There is no bar to our review of the court's refusal to amend the verdict sheet in that fashion, and, as noted, the accuracy of the verdict sheet and the accuracy of the first-degree assault instruction are linked. Indeed, they are premised on the same underlying issue.

We must decide, then, whether Sequeira's requested amendment to the verdict sheet instructing the jurors on the proper order of deliberation and his requested assault instruction focusing the jury on whether he committed first-degree assaults against the

---

[19]In civil cases, when the case is sent to the jury on issues, an objection to the verdict sheet is required for preservation. *See* Md. Rule 2-522(b)(5).

security guards, not against others, were correct statements of the law and were not otherwise covered by the instructions as given. *See* Md. Rule 4-325(c) (at request of a party, the court "shall instruct the jury as to the applicable law" unless the "matter is fairly covered by instructions actually given"); *Hayes v. State*, 247 Md. App. 252, 288 (2020) (trial court must give a requested instruction if it is a correct statement of the law, is applicable to the facts, and is not fairly covered by other instructions given).

For the reasons we have explained, Sequeira's two requests were legally accurate. The jurors should not have been permitted to base a guilty verdict for use of a firearm on the commission of a predicate crime other than those charged. And ever since *Mack v. State*, 300 Md. at 596, Maryland law has required that, upon request, a defendant in Sequeira's position is entitled to an order of deliberation instruction, which is what defense counsel was asking be included in the verdict sheet, so the jury is informed that conviction on the use of a firearm crime is dependent upon conviction of the predicate crime or crimes (here, the first-degree assaults against the security guards). *See, e.g., Davis v. State*, 196 Md. App. 81, 113 (2010) ("A verdict sheet guides a jury in navigating the charges that are before it, reminds the jury of the findings that must be made, and provides a mechanism for recording the jury's determination on each charge.") Likewise, because the first-degree assault counts specified the security guards as victims, Sequeira was entitled to an assault instruction naming the guards as victims (as the pattern instruction provides). The court's approval of an assault instruction that inserted the word "victims" in the space where the name of the victim (or victims) is supposed to be used was legally incorrect.

Moreover, the instructions as given by the court did not cover Sequeira's requested instructions. Rather, after giving the first-degree assault instruction identifying each victim as "victims," and not by name, the court instructed the jurors that the defendants were charged with "use of a firearm in the commission of a felony crime of violence," that the "felony crime of violence in this case is assault in the first degree," and that to convict on the use of a firearm count, "the State must prove that the defendants used a firearm in the commission of an assault in the first degree." That instruction incorrectly allowed the jurors to base a guilty verdict for use of a firearm upon a finding that Sequeira committed a first-degree assault against Hall or Powell or both.

These errors were not harmless, beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659 (1976). Indeed, we are confident that they produced the guilty verdict against Sequeira for use of a firearm. Accordingly, we shall reverse that judgment.

We briefly shall mention Sequeira's other arguments (except on legal sufficiency, discussed below). First, contrary to the State's position, Sequeira has not advanced an inconsistent verdict argument on appeal; therefore, it does not matter that he failed to raise that issue when the jury returned its verdict. The court's errors in the verdict sheet and the assault instruction, which Sequeira *has* raised on appeal, permitted the jury to return verdicts in his favor on the first-degree assault counts and against him on the use of a firearm count, based on a finding of the elements of uncharged first-degree assaults. Second, with respect to Sequeira's due process argument, the State asserts that he waived it by not challenging the indictment. For the reasons we have explained, there was no need to challenge the indictment: it was only logical to interpret the indictment as

charging Sequeira with use of a firearm in the commission of the charged felonies/crimes of violence against the security guards. In any event, Sequeira did not raise a due process issue at trial, nor did the court rule on one, so we agree for other reasons that the issue is not properly before this Court. *See* Md. Rule 8-131(a) (appellate court ordinarily will not decide any non-jurisdictional issue unless it was "raised in or decided by the trial court"). Especially given that we are reversing the use of a firearm judgment on other grounds, we will not deviate from that rule. Third, Sequeira's sentencing argument has been obviated by our reversal. Finally, as discussed below, his evidentiary insufficiency argument about the use of a firearm conviction is moot.

### (d)

In the section of his brief addressing sufficiency of the evidence, Sequeira asserts that "the evidence is insufficient to convict [him] of using and conspiring to use a handgun in the commission of a crime of violence."[20] He proceeds to lump together sufficiency arguments pertaining to his two convictions. They must be treated separately.

We have reversed Sequeira's use of a firearm conviction for trial court error, and Sequeira was acquitted of all the predicate crimes he was charged with. Those acquittals are final and under the law of Double Jeopardy cannot be undone. For the reasons discussed above, findings of the elements of uncharged predicate felonies/crimes of

---

[20]The State erroneously asserts in a footnote in its brief that Sequeira only challenges his conviction for use of a firearm, not his conviction for conspiracy to use a firearm. Throughout his brief, however, Sequeira asks this court to reverse and/or vacate his "convictions" and refers directly to the conspiracy to use a firearm conviction at various times.

violence against Hall and/or Powell, beyond a reasonable doubt, *cannot* support a guilty verdict for use of a firearm. And due to his acquittals, Sequeira *cannot* be found guilty of any of the charged predicate crimes. Therefore, Sequeira cannot be retried for use of a firearm in the commission of a predicate crime. Accordingly, whether the evidence was legally sufficient to support his conviction for use of a firearm in the commission of a felony or crime of violence is a moot question.

That leaves Sequeira's conviction for conspiracy to use a firearm in the commission of a felony or crime of violence. He takes the position that the evidence at trial was legally insufficient to support this conviction because there was no proof that he had advance knowledge that Brown was in possession of a firearm and the evidence did not show that he committed first-degree assaults against any of the security guards.

The standard of review for legal sufficiency in a criminal case is whether, on the evidence adduced at trial, viewed in the light most favorable to the State as the prevailing party, any reasonable juror could find the elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McClurkin v. State*, 222 Md. App. 461, 486 (2015). We "view[ ] not just the facts, but 'all rational inferences that arise from the evidence,' in the light most favorable to the prevailing party[,]" *Smith v. State*, 232 Md. App. 583, 594 (2017) (quotation omitted), giving "due regard to the fact finder's findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *Potts v. State*, 231 Md. App. 398, 415 (2016) (cleaned up).

Conspiracy is a common law crime consisting of an agreement to commit an unlawful act or to perform a lawful act by criminal means. *Pearlman v. State*, 232 Md. 251, 257 (1963). It is a misdemeanor, punishable pursuant to CL section 1-202, which limits the penalty that may be imposed upon a person convicted of conspiracy to the maximum penalty for the crime the person conspired to commit.

When the charged conspiracy is to commit a crime, the defendant "must have the specific intent to commit the offense which is the object of the conspiracy." *Alston v. State*, 414 Md. 92, 114-15 (2010). "The essence of a criminal conspiracy is. . . an unlawful agreement, which 'need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.'" *Molina v. State*, 244 Md. App. 67, 167-68 (2019) (quoting *Mitchell v. State*, 363 Md. 130, 145 (2001) (citations omitted)). "[T]he crime of conspiracy is complete without any overt act and . . . the particular means by which the criminal purpose is to be achieved need be neither alleged nor proved." *Rudder*, 181 Md. App. at 436. Conspiracy may be proven by "circumstantial evidence, from which a common scheme may be inferred." *Hall v. State*, 233 Md. App. 118, 138 (2017). "Joint participation by two or more codefendants. . . gives rise to at least a permitted inference" of an antecedent agreement by them to participate in the crime. *Jones v. State*, 132 Md. App. 657, 661 (2000).

Significantly, a person who has conspired to commit a crime may be guilty of conspiracy notwithstanding that he has been acquitted of the crime he conspired to commit. *Lanasa v. State*, 109 Md. 602, 607 (1909). As Judge Moylan has explained:

> Criminals sometimes fail. A failure successfully to carry out the plot, however, does not require the courts to go back and rewrite the plot. The conspiracy law's concern is with the plot as formed, not with the plot as executed.

*Rudder*, 181 Md. App. at 437.

In the case at bar, if the first-degree assault and use of a firearm charges had been tried as charged and as they should have been - - on the premise that the assaults were committed against the security guards and the firearm was used in the commission of those assaults - - acquittals on any of those crimes, even for legally insufficient evidence, would not undermine a conviction for conspiracy to use a firearm in the commission of the predicate crimes. What matters is the sufficiency of the evidence that Sequeira and Brown agreed to use a firearm in the commission of the first-degree assaults they were charged with, and had the specific intent to do so, not that they succeeded in committing that crime.[21]

On the record before us, there was sufficient circumstantial evidence to prove that Sequeira conspired with Brown and Rivas to use a firearm in committing assaults against the three security guards. Viewed most favorably to the State, the evidence showed that Sequeira, who was familiar with the restaurant as he used to date the bartender, came to the restaurant alone and had an intense interaction with Jermaine after witnessing him chastise a regular patron. When Jermaine suggested that they step outside to deal with the

---

[21]Sequeira's complaint that there was no evidence that he committed a first-degree assault himself is not pertinent to the issue of sufficiency of the evidence to prove a conspiracy to use a firearm in the commission of first-degree assaults against the security guards. Nevertheless, there was more than adequate evidence that Sequeira encouraged and aided in the commission of those crimes as an accomplice.

matter, Sequeira declined, saying, "I don't fight, I shoot." It would be reasonable to conclude from this interaction that Sequeira was threatening to use a gun to settle their dispute.

Sequeira left the restaurant and then returned about 20 minutes before closing time with Brown and Rivas. Instead of parking right in front of the restaurant as he had before, he positioned his car in the middle of the parking lot, facing the restaurant. For three minutes, Sequeira, Brown, and Rivas walked through the bar area of the restaurant, letting their presence be known, and interacted with the security guards on their way out. Speaking in an aggressive tone, Sequeira told Jermaine, "I'm going to see you, OG[,]" which Jermaine understood to be a threat. Brown got in Jermaine's face, *i.e.*, "kissing close," and asked, "What's up with you?" Jermaine took that as a threat as well.

Sequeira, Brown, and Rivas left the restaurant at fifteen minutes before closing. They sat in Sequeira's Mercedes, with Sequeira in the driver's seat, facing the restaurant, for fifteen minutes. Desmond and Jacobs waited outside the restaurant for Jermaine because Sequeira and Brown's threats made them concerned for his safety. After Jermaine came outside, Sequeira drove the Mercedes forward out of the parking space, turned right, and drove parallel to the sidewalk near the restaurant as one of the passengers, allegedly Brown, began shooting a gun out of the car window.

Reasonable jurors could find that after Sequeira's run-in with Jermaine, in which he announced that he resolves disputes by shooting, he rounded up Brown and Rivas to assist him in that endeavor. The three of them, acting together, returned to the restaurant, made more threats against Jermaine, and waited in Sequeira's Mercedes until the security

guards were outside. Then Sequeira drove through the parking lot and shots were fired from the car windows toward Jermaine and the guards. One reasonably could conclude from this evidence that this was not a random or spontaneous series of events. Rather, one could reasonably conclude that Sequeira deliberately planned to retaliate against Jermaine by making good on his threat to "shoot," that he conscripted Brown and Rivas to join, and that the three agreed to use a firearm to shoot at the security guards from Sequeira's car when the guards gathered outside at the end of their worknight. This is ample evidence of an agreement to commit the crime of use of a firearm and that Sequeira returned to the restaurant knowing that one of his cohorts was armed and that his role in committing the crime would be to drive his car while the shooting was carried out. The fact that none of the guards actually was shot is irrelevant.

Although the evidence is legally sufficient to support Sequeira's conviction for conspiracy to use a firearm to commit first-degree assaults against the security guards, we nevertheless must vacate the conviction. The case against Sequeira was not tried on crimes committed, or attempted, against the three security guards. As the case actually was tried, the jurors were permitted to find Sequeira guilty of conspiracy to use a firearm in the commission of first-degree assaults against Hall and/or Powell.[22] Because that was

---

[22]The conspiracy instruction was as follows:

The defendants are charged with the crime of conspiracy to commit assault in the first degree and use of a firearm in the commission of a crime of violence. Conspiracy is an agreement between two or more persons to commit a crime. In order to convict the defendants of conspiracy, the State must prove that the defendants agreed with at least one other person to

(continued…)

an option, we do not know whether the jurors found Sequeira guilty of conspiracy to use a firearm in the commission of a charged predicate crime or in the commission of an uncharged predicate crime. If it was the former, the agreement was to use a firearm in the commission of crimes against the security guards; if it was the latter, the agreement was to use a firearm in the commission of crimes against Hall and/or Powell. There was no evidence to support the latter agreement, however. Although it is likely that the jurors found that Sequeira conspired to use a firearm against the security guards, Jermaine in particular - - especially considering that they in fact found him guilty of the later-vacated crime of conspiracy to commit first-degree assault against Jermaine - - we cannot say beyond a reasonable doubt that that is what the jurors found. Accordingly, we shall vacate Sequeira's conviction of conspiracy to use a firearm in the commission of a felony or crime of violence, and remand for further proceedings not inconsistent with this opinion.

## II.

Because we have reversed or vacated Sequeira's convictions, we need not address his contention that he was denied effective assistance of counsel due to his lawyer's failure to object to three *voir dire* questions posed to the jury panel.

---

(…continued)
commit the crimes of assault in the first degree and use of a handgun in the commission of a crime of violence, and that the defendants entered into the agreement with the intent that the crimes of assault in the first degree and use of a handgun be committed.

**JUDGMENT FOR USE OF A FIREARM IN THE COMMISSION OF A FELONY OR CRIME OF VIOLENCE REVERSED; JUDGMENT FOR CONSPIRACY TO USE A FIREARM IN THE COMMISSION OF A FELONY OR CRIME OF VIOLENCE VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**